UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

LAURIE HOOD,

       Plaintiff,

    v.

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

       Defendant.

NO. CIV. S-07-01634 FCD/EFB

<u>MEMORANDUM AND ORDER</u>

----oo0oo----

    This matter is before the court on cross-motions for summary judgment filed by plaintiff Laurie Hood ("plaintiff") and defendant Hartford Life and Accident Insurance Company ("defendant" or "Hartford") pursuant to Federal Rule of Civil Procedure 56.[1]  Plaintiff moves for partial summary judgment as to her claims against defendant for breach of contract and breach of the implied covenant of good faith and fair dealing, arguing the court can find as a matter of law that defendant breached its duties under the contract and unreasonably denied her disability

---

[1]  Because oral argument will not be of material assistance, the court orders these matters submitted on the briefs.  E.D. Cal. L.R. 78-230(h).

1   benefits, thereby entitling her to contract and tort damages,
2   which amount can be later determined by the jury.  Defendant
3   moves for summary judgment, or in the alternative, partial
4   summary judgment, arguing it is entitled to judgment in its favor
5   on both of plaintiff's claims and therefore, nothing remains for
6   the jury to determine.

7        For the reasons set for below, plaintiff's motion is DENIED
8   and defendant's motion is GRANTED in part and DENIED in part.
9   Triable issues of fact remain as to the reasonableness of
10  defendant's denial of plaintiff's long term disability benefits
11  claim, and thus, the breach of implied covenant of good faith and
12  fair dealing claim cannot be resolved on summary judgment.
13  However, summary judgment may be granted in favor of defendant on
14  plaintiff's breach of contract claim as plaintiff cannot
15  demonstrate any contractual damages, and plaintiff's claim for
16  punitive damages must also be dismissed because she fails to show
17  any oppressive, malicious, or fraudulent conduct by defendant.
18  ///
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

2

1                          **BACKGROUND**[2]

2    **A.   General Background**

3         In 1990, plaintiff was insured through a Hartford Life and

4    Accident Insurance Policy issued to the State of California,

5    Department of Education, who employed plaintiff as an office

6    services supervisor.  (DRUF ¶ 1).  Hartford's long-term

7    disability policy provided for thirty months of benefits in the

8    event of total disability from a person's own occupation, and

9    thereafter, monthly benefits for total disability from any

10   occupation or work "for which you are or could become qualified

11   by (1) training; (2) education; or (3) experience."  (DRPR ¶ 1).

12        On or around October 10, 1990, plaintiff submitted a

13   disability claim to defendant following her report that she had

14   been unable to work as of April 30, 1990 due to back pain.  (Id.

15   ¶ 2).  Hartford approved plaintiff's claim for the payment of

16   monthly disability benefits.  (Id. ¶ 3).  Hartford began paying

17   plaintiff's long-term disability ("LTD") benefits on November 1,

18   _____

19        [2]   Unless otherwise noted, the facts recited herein are
     undisputed.  (Def.'s Reply to Pl.'s Resp. to Def.'s Stmt. of
20   Undisputed Facts ("DRPR"), filed Oct. 24, 2008; Def.'s Resp. to
     Pl.'s Stmt of Undisputed Facts ("DRUF"), filed Oct. 3, 2008).
21   Where the facts are disputed, the court recounts both parties
     versions of the facts.  (Pl.'s Stmt. of Undisputed Facts ("PUF"),
22   filed Sept. 11, 2008; Def.'s Stmt. of Undisputed Fact ("DUF"),
     filed Oct. 3, 2008).

23        Defendant's objection to plaintiff's submission of the
     Federal Rule of Civil Procedure 26 report of her designated
24   insurance expert, Paul Willihnganz, is overruled as moot.
     Reliance on said report is unnecessary to resolution of the
25   parties' motions.  However, the court notes that the report would
     not be properly admitted because it is hearsay.  Plaintiff
26   submits only the report and not the declaration of her expert,
     and thus, the court could not properly consider this evidence
27   regardless.  Because consideration of plaintiff's expert report
     is unnecessary to the motion, the court also does not consider
28   defendant's expert evidence offered in rebuttal.

                                    3

1990.  (DRUF ¶ 9).

In April 1991, while on disability for her back issues, plaintiff reported to Hartford that her preexisting Crohn's disease, diagnosed in 1984, was now flaring up and disabling. (DRPR ¶ 4).[3]  Dr. Gregg Nulton, plaintiff's primary physician since 1994, completed annual attending physician statements for plaintiff, reporting to Hartford during its annual review of plaintiff's claim, that her Crohn's disease was not well controlled and that she had frequent flare-ups which prevented her from returning to work.  (DRPR ¶¶ 6-7; DRUF ¶¶ 7-8). Hartford then continued payment of plaintiff's LTD benefits based on reports that her Crohn's disease was not well controlled. (Id. ¶ 5).  Dr. Abdul Khaleq, plaintiff's gastroenterologist, described plaintiff as having had "severe" Crohn's disease, resulting in approximately eight bowel resection surgeries compared to the "two to three surgeries on average." (DRUF ¶ 4; Pl.'s Ex. B at 103:6-16).

In February 2005, following plaintiff's last bowel resection surgery, Dr. Khaleq treated plaintiff with new therapies, immunosuppressants, and the biologic medication Humira.  (DRPR ¶ 10).  Plaintiff reported to Dr. Khaleq that since starting Humira, she had been much better, with only two to three bowel movements per day.  (Id. ¶ 11).  In addition, plaintiff's condition improved after she stopped smoking around the time of her February 2005 surgery.  (Id. ¶ 13).  Since approximately mid-

---

[3]   Crohn's disease is an inflammatory bowel condition that can involve both the small and large intestines. (Def.'s Ex. A at 13:25-14:5, filed Oct. 3, 2008).

4

2005, plaintiff had been in remission from her Crohn's disease, as demonstrated by the results of her colonoscopies.  (<u>Id.</u> ¶ 12).

### B.   <u>Review of Plaintiff's Claim</u>

In April 2006, as part of its periodic review of plaintiff's claim, Hartford obtained plaintiff's updated medical records from Dr. Nulton and Dr. Khaleq.  (<u>Id.</u> ¶ 15).  On April 12, 2006, Hartford called plaintiff to discuss the reasons she was unable to work and documented the conversation.  (DRUF ¶ 11).

> Plaintiff stated that she has "about 4 to 5 stools a day and must be near a restroom at all times.  She stated that she has a[n] enormous amount of muscle aches which impair her physical activities.  In addition to the muscle aches she has abdominal pain both continuous and associated with her diarrhea and it is felt that at least some of this is related to her adhesions from prior surgeries. . . . She does not attend church or outside activities due to her inability to sit for a prolong[ed] period of time and the need to be near a restroom."

(<u>Id.</u>)

On June 6, 2006, Bill Dillon ("Dillon"), Hartford's claim examiner assigned to review plaintiff's claim, sent Dr. Khaleq a letter seeking his opinion regarding plaintiff's capacity at that time for employment in a sedentary or light duty job.  (DRPR ¶ 16).  The letter separately described sedentary and light duty work,[4] asked Dr. Khaleq to indicate, which, if any, he thought

---

[4]   "Sedentary duty work" is described in the letter as: "no sitting longer than 1 to 3 hours at a time without the ability to get up and stretch or change positions.  No more than occasional standing or walking (1-2 hours total per workday).  No repetitive kneeling, crouching, stooping, reaching overhead, climbing stairs twisting or turning.  Has capacity to perform repetitive lifting, carrying, pushing or pulling no greater than 10 pounds occasionally.  Ability to use upper extremities to perform frequent to constant fingering, feeling and/or handling." (Def.'s Ex. 10).

"Light duty work" is described in the letter as: "has

plaintiff was capable of performing, and further requested that
if Dr. Khaleq did not believe plaintiff could work, he provide
additional medical information to support his opinion.  (DRPR ¶
17; Def.'s Ex. 10).  On June 14, 2006, Dr. Khaleq responded to
Hartford indicating his agreement that plaintiff appeared to have
"full-time capacity (8 hours per day) for employment" in
sedentary or light duty work, with certain restrictions and
limitations.  (DRPR ¶ 18; DRUF ¶ 12).  Dr. Khaleq did not provide
any additional medical records with his letter.  (DRPR ¶ 19).  On
June 22, 2006, Hartford sent Dr. Nulton the same letter sent to
Dr. Khaleq on June 6, 2006, requesting his opinion regarding
plaintiff's current capacity for full-time employment in a
sedentary or light duty job.  (DRPR ¶ 22).  Hartford also
enclosed Dr. Khaleq's June 14, 2006 response to its letter.
(Id.; Def.'s Ex. 12).

On July 7, 2006, Dr. Nulton responded to Hartford's letter
and stated that he did not believe plaintiff was capable of doing
sedentary or light duty work because of her Crohn's disease,
associated fatigue, medications which make her prone to
infections, and recent diagnosis of discoid lupus.  (DRPR ¶ 24).
Dr. Nulton also stated in his letter that:

///

ability to stand and/or walking longer than 2 to 3 hours at a
time with the ability to change positions; the ability to perform
occasional sitting (1-2 hours total per workday); no repetitive
kneeling, crouching stooping, reaching overhead, climbing stairs,
twisting or turning; ability to perform lifting, carrying,
pushing or pulling up to 20 pounds occasionally and up to 10
pounds frequently; can perform frequent to constant fingering,
feeling and/or handling (bilateral upper extremities)."  (Id.)

You [Hartford] indicated that Dr. Khaleq responded that he believed she [plaintiff] was capable of sedentary and/or light duty work. This was not the case. Dr. Khaleq has said that he thought that in signing the paper as he did he was continuing her disability as is, which was apparently not the case.

(Id. ¶ 23).

Thereafter, on July 10, 2006, Dillon faxed Dr. Khaleq stating, "[w]e were informed by Dr. Nulton that your reply to our letter of June 6 did not accurately reflect your opinion of Ms. Hood's ability to work. I am resending the letter to you so that you may change your responses, if you so desire." (Id. ¶ 30). Dillon never received a reply from Dr. Khaleq, so he followed up by phone to Dr. Khaleq's office on two subsequent occasions and re-faxed the letter on August 14, 2006 and September 12, 2006. (Id. ¶ 31). On September 28, 2006, Dillon spoke to Dr. Khaleq who told him that plaintiff's "Crohn's is quiescent, but she continues to have daily diarrhea. She has 8-10 [bowel movements] per day, which would make any job difficult." (DRUF ¶ 15; Pl.'s Ex. A, FN010). Dr. Khaleq further informed Dillon that plaintiff's "recent colonscopy [sic] confirmed Crohn's status," but thought that her diarrhea was caused by "short-bowel syndrome" and stress. (Pl.'s Ex. A, FN010). Further, Dr. Khaleq reported that if plaintiff was to return to work, she would need to have easy access to a restroom, but Dr. Khaleq was not sure a return to work would be successful. (Id.) On March 2, 2007, Dillon called plaintiff to ask about any recent changes and informed her that Hartford had received "different functional opinions from Dr. Nulton and Dr. Khaleq," and that though Dr. Nulton said Dr. Khaleq erred when replying, Dr. Khaleq did not

7

reply when asked to confirm this.  (DRPR ¶ 34; Def.'s Ex. 15, FN008).

On March 22, 2007, based on his discussion with a Hartford in-house nurse, Dillon requested a medical records review from a physician specialized in internal medicine or gastroenterology through an outside vendor, Reed Review Services.  (DRPR ¶ 36). Dr. Gregg Marella, a physician board certified in internal medicine, reviewed plaintiff's claim, spoke with Dr. Khaleq on April 2, 2007, and reported his findings in a report dated April 4, 2007.  (Id. ¶ 37).  Among the documents reviewed by Dr. Marella concerning plaintiff's claim included: attending physician statements of continued disability from 2001-2006; an operative report dated February 27, 2005; an office note dated April 12, 2005; and Dr. Nulton's letter dated June 22, 2006 and July 7, 2006.  (DRUF ¶ 30; Def.'s Ex. 18).

Dr. Marella reported that during his conversation with Dr. Khaleq he "initially said [plaintiff] was totally limited and unable to work in any capacity due to ongoing pain and diarrhea caused by her Crohn's disease." (Def.'s Ex. 18).  When Dr. Marella asked why plaintiff was not able to work in a sedentary capacity, Dr. Khaleq stated "well maybe she is." (Id.)  The report noted that Dr. Khaleq felt strongly that sedentary work would be all plaintiff would be able to do because of the amount of pain she could experience at various times during the day. (Id.)  Dr. Khaleq also expressed that one required limitation for plaintiff would be the need, during her flares, to have adequate and unrestricted bathroom privileges.  (Id.)  In addition, plaintiff would also need to be able to miss days of work at a

8

time during her flares due to chronic pain and bloody diarrhea.
(Id.)  On April 17, 2007, Dillon sent Dr. Nulton a copy of Dr.
Marella's report requesting Dr. Nulton to comment as to whether
he agreed or disagreed with the findings.  (Def.'s Ex. 19).   If
Dr. Nulton disagreed, he was to provide documentation supporting
his opinion, including all office notes and diagnostic results
since April 1, 2006.  (Id.)  Although Dr. Nulton received
Dillon's letter, Dr. Nulton never responded, never disputed Dr.
Marella's findings, and never sent any updated medical records as
requested by Hartford in the letter.  (DRPR ¶ 42; Def.'s Ex. 20).

In April 2007, Hartford's Rehabilitation Case Manager,
Marvin Bryant ("Bryant"), performed an Employability Analysis.
(DRUF ¶ 35; DRPR ¶ 44).  Bryant was provided with plaintiff's
educational and work history, which included high school with two
years of college and various clerical experience.  (DRPR ¶ 44).
In addition, Bryant had information that plaintiff owned a
personal computer and used email and also had information
concerning plaintiff's current medical status.  (Id.)  From the
12,741 occupations classified in the 1991 Dictionary of
Occupational Titles, Bryant identified three possible occupations
for which he felt plaintiff was qualified: appointment clerk,
election clerk, and lens inserter.  (DRUF ¶ 35).  Bryant made
adjustments to plaintiff's qualifications profile to reflect the
physical restrictions reported by Dr. Khaleq and Dr. Marella and
to reflect her past relevant work history and experience.  (DRPR
¶ 46).  Bryant eliminated potential occupations to reflect
plaintiff's absence from the work force and her need to have a
work environment with easy access to a restroom.  (Id.)  However,

the employability analysis did not factor in plaintiff's likely absences from work due to flare-ups. (Def.'s Ex. 21, HF0010). Bryant then requested that a Labor Market Survey be performed to determine if the three potential occupations (appointment clerk, election clerk, and lens inserter) he had identified for plaintiff were actually available within fifty miles of her home, to confirm the qualifications required for those occupations, and to confirm wages. (DRPR ¶ 47). Bryant concluded that appointment clerk was an appropriate occupation for plaintiff, as it was a sedentary office job allowing for access to a restroom, and such jobs were available in her local economy. (Id. ¶ 50).

### C.   **Denial of Plaintiff's Claim**

On June 28, 2007, defendant terminated plaintiff's LTD benefits. (Def.'s Ex. 23). Hartford reviewed all the papers in plaintiff's file including: the attending physician statement signed by Dr. Nulton on April 12, 2006; office notes and medical records from Dr. Nulton and Dr. Khaleq from April 2004-March 2006; functional capacity letter to Dr. Khaleq dated June 6, 2006 and his reply of June 13, 2006; functional capacity letter to Dr. Nulton dated June 22, 2006 and his reply of July 3, 2006; peer physician review by Dr. Marella dated April 4, 2007; letter to Dr. Nulton requesting his comments on the peer physician review dated April 17, 2007; and the employability analysis and labor market survey. (Id.) Based on the "combination of all the medical information in [plaintiff's] file," Hartford concluded that plaintiff was "able to perform sedentary work on a full-time basis." (Id.) Hartford also informed plaintiff that she could appeal Hartford's determination, with or without providing any

additional information if she wished, and Hartford would perform another review of her claim.  (DRPR ¶ 52).

**D.  Litigation**

Plaintiff did not appeal the denial of her claim, and instead filed this lawsuit one month later on August 9, 2007. (DRPR ¶ 53).  Plaintiff asserts claims for breach of contract and breach of the implied covenant of good faith and fair dealing by defendant.  (Pl.'s First Amended Compl. ("FAC"), filed July 29, 2008).  With regard to damages, plaintiff seeks full past, present and future benefits; general damages for mental and emotional distress and other incidental damages; and punitive damages.[5]  (FAC at 5:11-19).

In April 2008, Dr. Khaleq testified at his deposition in this case that he understood "full-time work" to mean forty hours a week and that his statements to Hartford regarding plaintiff's capacity for sedentary and light duty employment were accurate. (DRPR ¶ 54; Def.'s Ex. A at 113:3-8 and 109:15-17).  However, later in his deposition, Dr. Khaleq expressed that when he initially responded to Hartford and confirmed that plaintiff had full-time capacity (eight hours per day) for employment, he thought plaintiff could more appropriately work twenty hours a week at five or six hours per day.  (DRPR ¶ 55; Def.'s Ex. A at 112:11-24).  Dr. Khaleq testified that he did not understand full-time capacity to mean forty hours per week because "you could work eight hours one day and then not work the next day."

_____

[5]     Plaintiff also seeks trebling of punitive damages pursuant to California Civil Code § 3345.  (See Mem. & Order, filed July 28, 2008, permitting assertion of said statutory damages claim; FAC at 5:4-10.)

1  (DRUF ¶ 22; Pl.'s Ex. B at 124:7-19).  Additionally, during his

2  deposition, Dr. Khaleq produced for the first time letters to Dr.

3  Nulton.  (Pl.'s Ex. C).  The first letter, dated June 29, 2006,

4  noted that for plaintiff "to engage in full-time work or even

5  part-time work might be difficult given that she has to visit the

6  restroom frequently and that stress may exacerbate her symptoms."

7  (Id. at EKG-119-120).  The second letter, dated April 3, 2007,

8  noted that "the patient seems to be doing well as far as Crohn's

9  disease and irritable bowel syndrome are concerned.  She should

10 be able to do very modified, sedentary work; but this may still

11 have to be part-time as discussed with the patient."  (DRUF ¶ 16;

12 Pl.'s Ex. C at EKG-117).  Dr. Khaleq also testified that

13 plaintiff could commute fifty miles to work, stating that she

14 "could probably drive for an hour and be fine."  (DRPR ¶ 61).

15 However, Dr. Khaleq also testified that he believed "beyond fifty

16 miles is too much for [plaintiff] . . . I would say more

17 accurately twenty, thirty miles is probably better."  (Pl.'s Ex.

18 B at 123:11-25).

19      In June 2008, Dillon testified during his deposition that

20 based on receipt from counsel of Dr. Khaleq's deposition

21 transcript and additional medical records provided by Dr. Khaleq,

22 he considered re-opening plaintiff's claim and discussed this

23 with his department director.  (DRPR ¶ 56; Def.'s Ex. G at 9:7-25

24 and 10:1-5).  Dillon testified that the main focus of the

25 reconsideration to re-open plaintiff's claim was Hartford's

26 previous reliance on Dr. Khaleq's multiple statements to the

27 company that he believed plaintiff was capable of full-time,

28 sedentary work.  (DRPR ¶ 57).  However, during Dr. Khaleq's

deposition, he testified for the first time that his interpretation of "full-time" meant plaintiff was in fact capable of working eight hours a day, but just not every day, and that twenty hours a week was more appropriate.  (<u>Id.</u>)  After determining that, under part-time employment, plaintiff would still be considered totally disabled, Dillon recommended to his supervisor on June 4, 2008 that plaintiff's claim be re-opened and benefits be reinstated, to which his supervisor agreed.  (<u>Id.</u> ¶ 58).

On June 4, 2008, Dillon sent a letter informing plaintiff that her claim had been reopened, benefits reinstated, with monthly benefits resuming on July 31, 2008.  (<u>Id.</u> ¶ 59).  Hartford issued two checks to plaintiff: one for $8,882.04, representing benefits from July 1, 2007 through June 30, 2008; and another for $414.69 representing interest on the benefits.  (<u>Id.</u> ¶ 60).

On September 11, 2008, plaintiff filed the instant motion seeking partial summary judgment on her claims for breach of contract and breach of the implied covenant of good faith and fair dealing.  (Pl.'s P. & A. for Partial Summ. J. ("Pl.'s P. & A."), filed Sept. 11, 2008).  Defendant then filed an opposition and a cross-motion for summary judgment or, in the alternative, partial summary judgment regarding plaintiff's claims.  (Def.'s Opp'n & Cross-Mot. for Summ. J. ("Def.'s P. & A."), filed Oct. 3, 2008).[6]

---

[6]    Both motions were set on the court's October 31, 2008 law and motion calendar.

13

**STANDARD**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).

When parties submit cross-motions for summary judgment, the court must review the evidence submitted in support of *each* cross-motion and consider each party's motion on its own merits. <u>Fair Housing Council of Riverside County, Inc. v. Riverside Two</u>, 249 F.3d 1132, 1136 (9th Cir. 2001).  The court must examine each set of evidence in the light most favorable to the non-moving party.  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  <u>Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585-87 (1986); <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 288-89 (1968). Genuine factual issues must exist that "can be resolved only by a finder of fact, because they may reasonably be resolved in favor of either party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,

256 (1986).

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence.  See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  The evidence presented by the parties must be admissible.  Fed. R. Civ. P. 56(e).  Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.  See Falls Riverway Realty, Inc. v. City of Niagara Falls, 754 F.2d 49, 57 (2d Cir. 1985); Thornhill Publ'g Co., Inc. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979).

**ANALYSIS**

**A.    Breach of Contract**

Defendant argues that it is entitled to summary judgment on plaintiff's breach of contract claim because plaintiff has failed to demonstrate any damages, which is an essential element of the claim.  Defendant contends that since Hartford reinstated her benefits, including past benefits plus interest, plaintiff has been made whole under the terms of the policy, and thus, she has no cognizable contract damages.

In California, "[a] cause of action for breach of contract requires proof of the following elements: (1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." CDF Firefighters v. Maldonado, 158 Cal. App. 4th 1226, 1239 (2008).  California

15

Insurance Code section 10111 provides "[i]n life or disability insurance, the only measure of liability and damage is the sum or sums payable in the manner and at the times as provided in the policy to the person entitled thereto."  Further, California Civil Code section 3302 limits damages from a breach of contract to pay money to "the amount due by the terms of the obligation, with interest thereon."

Here, plaintiff has failed to demonstrate any resulting damage from defendant's breach of the insurance policy.  Hartford sent a letter to plaintiff on June 4, 2008 informing plaintiff that her claim had been reopened, benefits reinstated, with monthly benefits resuming on July 31, 2008.  (DRPR ¶ 59). Hartford issued two checks to plaintiff: one for $8,882.04, representing benefits from July 1, 2007 through June 30, 2008; and another for $414.69 representing interest on the benefits. (Id. ¶ 60).  As a result, based on this undisputed evidence, plaintiff was made whole when the LTD benefits denied by Hartford on June 28, 2007 were reinstated, with defendant paying plaintiff the full amounts owed to her under the policy, including interest.  Plaintiff has, therefore, failed to establish any contractual damages arising from defendant's breach of contract in previously denying her benefits.[7]  Thus, defendant's motion

---

[7]    In her opposition, plaintiff argues that the breach of contract claim must be considered at the time the complaint was filed, when damages were unpaid and outstanding.  (Pl.'s Opp'n & Reply ("Opp'n") 6:6-8, filed Oct. 17, 2008).  Plaintiff cites to Rabinowitz v. Paul Revere Life Insurance Company, 91 Fed. Appx. 563 (9th Cir. 2004), where the court stated that the insured had a valid breach of contract claim on the grounds that he was not timely paid in accordance with the terms of the contract.  Id. at 566 n.1.  However, in that case, the court also noted that the insured had allegedly suffered some cognizable economic damage

for summary judgment on the breach of contract claim is GRANTED.

**B.    Breach of the Implied Covenant of Good Faith and Fair Dealing**

Under California law, all insurance contracts contain an implied covenant of good faith and fair dealing.  <u>Egan v. Mutual of Omaha Ins. Co.</u>, 24 Cal. 3d 809, 818 (1979).  The fundamental principle of this implied covenant is "that neither party will do anything which will injure the right of the other to receive the benefits of the agreement."  <u>Waller v. Truck Ins. Exch., Inc.</u>, 11 Cal. 4th 1, 36 (1995).  A cause of action for breach of the implied covenant is characterized as "insurance bad faith," for which an insured may recover tort damages.  <u>Archdale v. American Int'l Specialty Lines Ins. Co.</u>, 154 Cal. App. 4th 449, 467 n.19 (2007).

The implied covenant of good faith and fair dealing is breached when an insurer delays or denies payment of policy benefits unreasonably or without proper cause.  <u>Jordan v. Allstate Ins. Co.</u>, 148 Cal. App. 4th 1062, 1072 (2007); <u>see also</u> <u>Wilson v. 21st Century Ins. Co.</u>, 42 Cal. 4th 713, 723 (2007) ("an insurer's denial of or delay in paying benefits gives rise to tort damages only if the insured shows the denial or delay was unreasonable.").  The "key to a bad faith claim is whether or not the insurer's denial of coverage was reasonable. . . . [T]he reasonableness of an insurer's claim-handling conduct is ordinarily a question of fact."  <u>Hangarter v. Provident Life &</u>

due to the insurer's actual and threatened withholding of payments.  <u>Id.</u>  In contrast, plaintiff has not alleged any such economic damage here, outside the denial of her LTD benefits, which she has received in full.

Accident Ins. Co., 373 F.3d 998, 1009-10 (9th Cir. 2004) (citing Amadeo v. Principal Mut. Life Ins. Co., 290 F.3d 1152, 1161 (9th Cir. 2002).

Plaintiff argues that defendant breached the implied covenant of good faith and fair dealing because it acted unreasonably in denying plaintiff's claim.  First, plaintiff claims that Hartford terminated benefits without a full or proper investigation; specifically, defendant failed to obtain plaintiff's current medical records.  However, defendant maintains that it acted reasonably and in good faith in investigating plaintiff's claim by requesting her medical records, as well as contacting Dr. Khaleq.  Second, plaintiff contends that Hartford failed to investigate whether a real-world employer would hire plaintiff given her past extended absence from the workforce, her need to be near a restroom at all times, and her likely absences from work due to Crohn's disease flare-ups.  Hartford argues that it properly evaluated plaintiff's employment prospects in her local economy.

### 1. Improper or Inadequate Investigation[8]

The insurer's duty to protect the insured's interests obligates it to investigate a claim thoroughly.  "[I]t is essential that an insurer fully inquire into possible bases that

---

[8]    In opposing and moving for summary judgment, defendant does not rely on the "genuine dispute doctrine," which provides that "where there is a *genuine issue* as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute."  Chateau Chamberay Homeowners Assoc. v. Associated Int'l Ins. Co., 90 Cal. App. 4th 335, 347 (2001).  Therefore, the court only considers the propriety of defendant's investigation into plaintiff's claim.

might support the insured's claim. . . . [A]n insurer cannot reasonably and in good faith deny payments to an insured without thoroughly investigating the foundation for its denial." <u>Egan</u>, 24 Cal. 3d at 819.  For example, "denial of a claim on a basis unfounded in the facts known to the insurer, or contradicted by those facts, may be deemed unreasonable." <u>Wilson</u>, 42 Cal. 4th at 721.  The "insurer may not just focus on those facts which justify denial of the claim." <u>Id.</u>  Moreover, "the reasonableness of the insurer's decisions and actions must be evaluated as of the time that they were made; the evaluation cannot fairly be made in the light of subsequent events that may provide evidence of the insurer's errors." <u>Chateau Chamberay</u>, 90 Cal. App. 4th at 347.  In sum, the test of reasonableness of "an insurer's good or bad faith must be evaluated in light of the *totality of the circumstances* surrounding its actions." <u>Wilson</u>, 42 Cal. 4th at 723 (emphasis added) (citing <u>Nager v. Allstate Ins. Co.</u>, 83 Cal. App. 4th 284, 288 (2000); <u>Walbrook Ins. Co. v. Liberty Mutual Ins. Co.</u>, 5 Cal. App. 4th 1445, 1455-56 (1992)).

On a motion for summary judgment, a triable issue of fact as to the reasonableness inquiry may be found where an insurer denies an insured's claim without conclusive medical support to substantiate its denial.  <u>See Wilson</u>, 42 Cal. 4th at 721-22 (triable issue of fact as to whether the insured's neck pain was caused by a car collision or whether it was caused by a preexisting degenerative disc disease.  The court noted that a reasonable jury could find that nothing in the insured's medical records justified the claim examiner's conclusion that the insured's pain was due to any preexisting condition).

19

Here, plaintiff argues that defendant, in bad faith, failed to obtain plaintiff's medical records for the preceding fifteen months prior to termination of her LTD benefits.  Thus, plaintiff contends that defendant's "outright failure to obtain up-to-date medical records signifies its motives in putting its own interests far ahead of [plaintiff's]." (Pl.'s P. & A. at 18:20-22).  Plaintiff submits evidence that in April 2006, defendant requested plaintiff's medical records from "January 25 to the present" from Dr. Khaleq and Dr. Nulton. (Pl.'s Ex. A, HF0115, HF0186).  Plaintiff maintains that this was Hartford's last request for medical records before the termination of her benefits, which resulted in Hartford receiving medical records dated only up to March 2006. (Pl.'s P. & A. at 18 n.9).

In contrast, defendant argues that it reasonably investigated plaintiff's claim in good faith by relying on plaintiff's medical records, in addition to requesting opinions from Dr. Khaleq, Dr. Nulton, and Dr. Marella.  In its termination letter to plaintiff, defendant informed plaintiff that it based its denial of her claim on the following medical records:

- the attending physician's statement signed by Dr. Nulton on April 12, 2006;
- office notes and medical records from Dr. Nulton and Dr. Khaleq from April 2004 through March 2006;
- functional capacity letter to Dr. Khaleq dated June 6, 2006, and his reply of June 13, 2006;
- functional capacity letter to Dr. Nulton dated June 22, 2006, and his reply of July 3, 2006;
- peer physician review by Dr. Marella, a board certified internist, dated April 4, 2007;
- letter to Dr. Nulton dated April 17, 2007, requesting his comments on Dr. Marella's peer physician review.

(Def.'s Ex. 23).  In denying plaintiff's claim, defendant also relied on the opinion of plaintiff's gastroenterologist, Dr.

20

Khaleq, who informed Hartford on June 14, 2006 that he believed plaintiff was capable of sedentary and/or light duty work given certain restrictions and limitations. (Def.'s Ex. 11).  However, plaintiff's primary physician, Dr. Nulton, disagreed with Dr. Khaleq's opinion that plaintiff was capable of such work. (Def.'s Ex. 13).  In Dr. Nulton's response letter to Hartford, he stated that Dr. Khaleq "said he thought that in signing the paper as he did he was continuing [plaintiff's] disability as is, which was apparently not the case." (PRUF ¶ 23; Def.'s Ex. 13).  Based on Dr. Nulton's statement, Hartford re-faxed the letter requesting Dr. Khaleq's opinion as to plaintiff's ability to work in a sedentary and/or light duty capacity on July 10, 2006; August 24, 2006; and September 12, 2006, with no reply. (DRPR ¶¶ 30-31; Def.'s Ex. 14).  However, on September 28, 2006, Dillon spoke with Dr. Khaleq by telephone. (DRUF ¶ 15).  Dr. Khaleq opined that if plaintiff were to return to work, "she would need to have easy access to a restroom, but is not sure it would be successful." (Pl.'s Ex. A, FN010).  Thereafter, on April 2, 2007, Dr. Marella, Hartford's independent physician, spoke with Dr. Khaleq.  (DRPR ¶ 37; Def.'s Ex. 18).  Dr. Khaleq informed Dr. Marella that plaintiff may be able to work in a sedentary capacity, but it would be all that plaintiff could do. (Def.'s Ex. 18).  In addition, plaintiff would have to have unrestricted bathroom privileges, in addition to days off due to flare-ups causing pain and bloody diarrhea.  (Id.)

Based on the evidence proffered by both plaintiff and defendant, triable issues of material fact exist as to whether defendant conducted a proper and adequate investigation of

plaintiff's claim.  Although plaintiff relies on Hartford's April 2006 letter as the *last* request for medical records, defendant proffers evidence of other requests for medical records.  While the April 2006 letter was the only *formal* request for medical records provided by Hartford, other medical record requests were made with the letters sent to Dr. Khaleq and Dr. Nulton on June 6, 2006; June 22, 2006; July 10, 2006; August 14, 2006; and September 12, 2006 requesting their opinions as to plaintiff's ability to work in a full-time, sedentary and/or light duty capacity.  These letters further requested a response with "specific medical information" if Dr. Khaleq and Dr. Nulton disagreed with plaintiff's ability to work in any such capacities.  As a result, Hartford's follow-up letters to Dr. Khaleq seeking clarification as to his opinion that plaintiff was able to work in a full-time sedentary and/or light duty capacity could be seen, by a reasonable juror, as requests for further medical information.

In addition, although plaintiff focuses on defendant's failure to request medical records, defendant did make attempts to contact Dr. Khaleq by telephone.  Such communications, although not formal records, are nevertheless consultations with plaintiff's treating physician and constitute part of defendant's good faith attempts to conduct a thorough investigation.  Cf. Egan, 24 Cal. 3d at 817-19 (breach of covenant of good faith and fair dealing where insurer made no effort to have insured examined by doctor of its choice or to consult with insured's treating physician prior to denying insured's disability claim).  However, there was almost a six month gap between Dillon's phone

1  call with Dr. Khaleq on September 28, 2006 and Dr. Marella's

2  phone call with Dr. Khaleq in April 2007.  Thus, triable issues

3  of fact exist as to whether this, in conjunction with defendant's

4  other conduct, amounted to a failure to *thoroughly investigate*

5  plaintiff's claim.

6      Finally, defendant's reinstatement of plaintiff's LTD

7  benefits, despite its earlier denial, may mitigate in favor of a

8  finding that defendant acted in good faith.  "The insurer's

9  willingness to reconsider its denial of coverage and to continue

10 an investigation into a claim has been held to weigh to favor of

11 its good faith."  <u>Shade Foods, Inc. v. Innovative Products Sales</u>

12 <u>& Marketing, Inc.</u>, 78 Cal. App. 4th 847, 880 (2000).  Conversely,

13 "the insurer's early closure of an investigation and

14 unwillingness to reconsider a denial when presented with evidence

15 of factual errors will fortify a finding of bad faith."  <u>Id.</u>

16 Thus, after defendant was presented with evidence supporting a

17 re-opening of plaintiff's claim, namely Dr. Khaleq's deposition

18 testimony and production of additional medical records, it did

19 indeed reverse its earlier decision to terminate plaintiff's LTD

20 benefits.  However, triable issues still exist as to whether

21 these records were or should have been requested earlier,

22 especially since the records dated June 29, 2006 and April 3,

23 2007 were in existence prior to Hartford's June 28, 2007

24 termination of plaintiff's LTD benefits.

25     As a result, because triable issues of fact exist regarding

26 whether defendant failed to properly investigate plaintiff's

27 claim, plaintiff's and defendant's motions for summary judgment

28 must be DENIED on this basis.

23

### 2.   **Real World Employability**

The test of total disability requires that "the real-world employment marketplace be considered in determining whether an insured is totally disabled." Moore v. American United Life Ins. Co., 150 Cal. App. 3d 610, 630 (1984); see also Erreca v. Western States Life Ins. Co., 19 Cal. 2d 388, 394-95 (1942).  Thus, in assessing the employment prospects of an insured, "the *actual* employment prospects are to be considered in determining the duties of an insurer under a disability policy." Moore, 150 Cal. App. 3d at 630.  "[I]n determining whether the insured is disabled to such an extent as to prevent him from engaging in any occupation or performing any work for any kind of compensation within the meaning of a [disability policy], *the test is not some fanciful or imaginary occupation in which there is no likelihood of anyone employing the insured*." Id. (emphasis in original). As a result, the ability of an insured to work cannot be rationally divorced from a consideration of the actual market for the insured's skills or services.  Id.

Plaintiff argues that Hartford failed to consider her real world employability prospects in concluding that she would be able to return to work.  In particular, plaintiff contends that defendant failed to consider her absence from the workforce for over seventeen years, her lack of experience or training as an appointment clerk, her need to have unrestricted bathroom privileges throughout the workday, and her likely absences from work for days at a time due to Crohn's disease flare ups.  In addition, plaintiff argues that defendant expected an unreasonable commute by identifying employers within a fifty mile

24

radius of plaintiff's home, resulting in a one hour drive for
plaintiff.   Plaintiff further maintains that Hartford failed to
investigate whether any of the employers identified in the Labor
Market Survey would actually consider hiring plaintiff given her
limitations.

     Plaintiff proffers evidence to suggest that Bryant, in
requesting the Labor Market Survey, did not provide information
as to plaintiff's seventeen year absence from the workforce,
plaintiff's need to be in close proximity to a restroom and her
need for unrestricted bathroom breaks, and plaintiff's likely
need to miss days of work due to Crohn's disease flare ups.
(Pl.'s Ex. E at 21:6-22).   However, in Bryant's deposition, he
testified that he believed such factors would not "limit
employment for the occupation that was identified [i.e.,
appointment clerk]."   (Id. at 24:20-25).   With regard to
potential employers within a fifty miles radius of plaintiff's
home, plaintiff submits evidence that Dr. Khaleq testified in his
deposition that "beyond fifty miles is too much for [plaintiff]
. . . I would say more accurately twenty, thirty miles is
probably better."   (Pl.'s Ex. B at 123:11-25).

     However, defendant argues that it did in fact take into
consideration plaintiff's extended absence from the workforce,
plaintiff's need to have easy access to a restroom, and
plaintiff's need to miss some days due to occasional flare-ups of
her Crohn's disease.   Defendant also contends that plaintiff was
able to drive fifty miles, and that such a commute would not be
unreasonable.   Defendant proffers evidence to suggest that
information as to plaintiff's limitations was not provided for

the Labor Market Survey because the purpose of such a survey was
to look at whether the position of appointment clerk, lens
inserter, or election clerk existed on a full-time basis, the
number of positions in existence with a given employer, and the
job duties, physical requirements, qualifications, and
approximate pay for the positions. (Def.'s Ex. 22). Indeed,
according to defendant, Bryant took into consideration
plaintiff's limitations when he determined that only the
appointment clerk position would be an appropriate occupation for
plaintiff. (Def.'s Ex. 21). Furthermore, defendant submits
evidence that suggests that fifty miles was not an unreasonable
commute for plaintiff. In Dr. Khaleq's deposition, he stated
that "if [plaintiff] has two or three bowel movements in a
twenty-four hour period, she could probably drive for an hour and
be fine." (Def.'s Ex. A at 123:1-3).

        Based on the evidence proffered by plaintiff, a reasonable
jury could find that defendant's Employability Analysis and Labor
Market Survey did not take into account plaintiff's real world
employability prospects. While defendant's Employability
Analysis does account for plaintiff's absence from the workforce
due to disability and her need to have unrestricted and easy
access to a restroom, it does not, as plaintiff emphasizes,
consider her likely absences from work due to Crohn's flare-ups.
(Def.'s Ex. 21). In fact, likely absences from work are not to
be taken lightly by any employer, especially considering
plaintiff's other limitations. In addition, there are issues of
fact as to plaintiff's ability to drive fifty miles from her home
for any employment. Dr. Khaleq's deposition testimony suggests

that plaintiff was more capable of driving twenty to thirty miles.  Therefore, a reasonable jury could find that defendant's employability analysis was inadequate.

However, defendant provides evidence to suggest that it did properly assess plaintiff's employability prospects prior to determining that she could find work as an appointment clerk. Contrary to plaintiff's contention that defendant did not properly take into account plaintiff's limitations in the Labor Market Survey, defendant submits evidence to suggest that the purpose of such a survey was to determine whether potential jobs were actually present in plaintiff's local economy and to confirm the qualifications and wages for such jobs.  Further, even assuming the existence of employment in plaintiff's local economy, there are genuine issues of fact as to whether plaintiff was able to commute fifty miles for employment.  Dr. Khaleq also said in his deposition that plaintiff could probably "drive for an hour and be fine."

Because both plaintiff and defendant have proffered enough evidence to support their arguments, a reasonable jury could find for either party as to whether plaintiff's real world employability prospects were considered in determining that she would be competent to work as an appointment clerk.  Thus, plaintiff's and defendant's motions for summary judgment are alternatively DENIED on this basis.

      **C.**   **Punitive damages**

Defendant argues that there are no facts supporting plaintiff's entitlement to punitive damages.  Under California Civil Code 3294(a):

27

> In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.

Plaintiff has not proffered any argument or evidence supporting her assertion of punitive damages.  Indeed, in plaintiff's motion for partial summary judgment and in her opposition and reply, she fails to discuss punitive damages at all.  In light of plaintiff's complete failure to present "clear and convincing evidence" that defendant is guilty of "oppression, fraud, or malice," defendant's motion for summary judgment must be GRANTED.[9]

### CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment on plaintiff's breach of contract and punitive damages claims is GRANTED.  However, plaintiff's and defendant's motions for summary judgment on the breach of implied covenant of good faith and fair dealing claim are DENIED.

IT IS SO ORDERED

DATED: December 1, 2008.

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE

---

[9]     As a result, plaintiff's statutory claim for trebling of punitive damages pursuant to California Civil Code § 3345 is likewise dismissed.

28